Charles and Mary **PARSONS**, Plaintiffs,

v.

**UNITED STATES of America,**
**Defendant.**

**No. CV–F–90–462 OWW.**

United States District Court,
E.D. California.

May 26, 1992.

---

**1412**

Gary P. Dambacher, Sonora, CA, William F. Schroeder, Vale, OR, for plaintiffs.

Daniel Bensing, U.S. Atty.'s Office, Fresno, CA, for defendant.

## MEMORANDUM OPINION RE DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

WANGER, District Judge.

### I

### BACKGROUND

This case arises from the destruction of 500 acres of plaintiffs' timber during a wildland fire in the Groveland Range District of the Stanislaus National Forest. Plaintiffs allege that the negligence of various National Forest Service employees during attempts to fight this fire proximately caused the destruction of plaintiffs' proper-

ty. Plaintiffs seek damages under the Federal Tort Claims Act[1]. Defendant seeks summary judgment on two alternative grounds: 1) The discretionary function exception to the FTCA removes the court's subject matter jurisdiction over this case or 2) California law, to which the FTCA substantively refers, does not impose liability under these facts.

### Summary of Facts

Between August 27 and August 31, 1987, lightning strikes ignited at least 20 separate wildland fires in the Groveland Ranger District while an additional 40 fires started elsewhere in the Stanislaus National Forest during the same period. (Def. Statement of Material Facts ("SF"); Severietti Dec. ¶ 5). At 3 PM on August 30, 1987, Forest Service lookout Patsy Hamm detected a lightning strike ignition approximately one mile east of Smith Peak. ("Hamm fire") She immediately reported the ignition to Tom James. (Hamm Dep. at 25) Forest Service officer Jerry Disney was designated Incident Commander. (James Dep. at 34) Disney began driving to the Hamm fire with a three person crew but had difficulty locating it and did not arrive until approximately 4 PM. (Disney Dep. at 24). Plaintiffs allege that the trip should have only taken a half hour, and that the delay combined with Disney's use of an inexperienced crew hampered initial efforts to fight the Hamm fire. (Plf. Opp. at 5)

Disney and his crew began building a fireline[2] around the fire which was approximately one acre at this time. The line was approximately 2 feet wide and was finished around 6:30 PM. (Disney Dep. at 24–29) Recognizing the need for more help, and unable to reach the Station by radio, Disney left his crew and returned to the Station around 7 PM. (Id. at 27–28; Thornton Dep. at 56–57).

Back at the Station, Disney met strike team leader Tom Cashman. Cashman told him he could assemble his crew in a matter of minutes but Disney described the Hamm

---

**1.** 28 U.S.C. 2674, et seq.

**2.** A fireline is a path cut through wildland vegetation down to the earth to remove fuels and

starve an approaching wildfire. Firefighters Guide at 52.4—1 to 52.4; 70—8; Dep. of Severietti at 59:5–25.

fire as a "little lightning fire" and did not wait for the crew. Instead, Disney drove down the road nearest the Hamm fire with Cashman, then Cashman returned to the station, assembled his 24 person crew and returned to the fire at about 7 PM. (Cashman Dep. at 33, 40) By the time Cashman arrived, the fireline had broken because debris rolled downhill igniting fuels on the other side of the line. (Cashman Dep. at 40–44).

Disney did not return to the site with Cashman and his crew. A witness testified that in the early evening on August 30, there were resources available at the Station, there were "many people there and much activity." (Thornton Dep. at 57 and 67) At about 10 PM on August 30th, Cashman left the firesite and drove to the Station but was informed that most personnel were meeting at the Buck Meadows Community. (Cashman Dep. at 50, 52) Cashman then told the communications officer of the need for more resources but neither went to the Kassabaum Fire Camp where these resources were located nor travelled to the Buck Meadows Community. After returning to the fire, Cashman drove back to the Station again at 3 AM on August 31st but again found only the communications officer. This time he did drive to the Kassabaum Fire Camp but was told there were no additional resources available. (Cashman Dep. at 58).

At 5 PM on August 30th, Fire Management Officer Rob McClelland arrived at the Station and was told to stand by at the Kassabaum Fire Camp. He stayed at the Camp until an August 31st 5 AM briefing during which he allegedly received little pertinent information. (McClelland Dep. at 33–34) McClelland arrived at the Hamm firesite at approximately 9 AM with two 20 person crews and relieved the Cashman crew. Handcrews, dozers and helicopters continued to attack the fire all day. At approximately 12 Noon, the winds picked up and blew the fire North, threatening the town of Buck Meadows. At this point, Tom James ordered the evacuation of Buck Meadows and a shift of resources to pro-tect the Pines Campground. (McClelland Dep. at 66; James Dep. at 63–64).

Jim Cereghino, a heavy equipment operator for the County Road Department, testified that at 2 PM on August 31st he saw no fire suppression activity at the Burch Meadow intersection. He also testified that Forest Service personnel refused his offer of two Cat graders for use in fire suppression. (Cereghino Dep. at 18–21, 38). Defendant responds that these graders are wheeled vehicles of little value in combatting a wildland fire. (Def. Reply at 10) On the same day, another witness also observed other vehicles parked at the Burch Meadows intersection. (Henley Dep. at 2–4).

In the afternoon of August 31st, the wind shifted to the southwest and the fire moved towards Smith Station Road. Due to wind shifts, the fire threatened approximately 30 homes along a 1½ mile stretch of the road. (James Dep. at 68–69) By the evening of August 31, 1987, the western edge of the Hamm fire had rolled down most of Smith Ridge and was in the process of destroying plaintiffs' property. (Crow Dec. and videotape) In an attempt to stop this progression, Forest Service employee Mike New ignited portions of plaintiffs' property as part of a "burnout."[3] The burnout stretched approximately 200 yards along the western front of the fireline. (New Dep. at 44, 50; Bailey Dep. at 50–51).

Within minutes of the burnout ignition, the wind picked up and blew the fire North which created dozens of spot fires. Plaintiffs allege that the attempted burnout caused the ignition of gases that had accumulated in the air. (Plfs. Opp. at 44 citing Atkin Dep. at 59).

A document entitled "California Incident Priorities" prepared by the Forest Service and other state and federal agencies ranked the Hamm fire as the 16th priority. (Oberto Dec., Exh. 7). Three other fires within the Groveland Ranger District ranked higher: The River fire was number

---

**3.** During a burnout, one lights fuels along a     fireline so an advancing fire has no fuel.

4, the Grizzly fire was number 11, and the Larsen fire was number 15.

## II

## STANDARDS ON MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catratt,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 2512–14. The Court in *Celotex* elaborated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.

477 U.S. at 322–323, 106 S.Ct. at 2552. This standard applies in the Ninth Circuit. *Shaw v. Lindheim,* 908 F.2d 531, 536–537 (9th Cir.1990); *U.S. v. Lot 4, Block 5 of Eaton Acres,* 904 F.2d 487, 490 (9th Cir. 1990).

The Court is not obligated to consider matters not specifically brought to its attention. *Frito–Lay, Inc. v. Willoghby,* 863 F.2d 1029, 1034 (D.C.Cir.1988). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202. Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under rules governing admission of evidence generally. *Hal*

*Roach Studios, Inc. v. Feiner & Co., Inc.,* 883 F.2d 1429, 1437 (9th Cir.1989).

The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538. Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Anderson v. Liberty Lobby, supra,* 477 U.S. at 255, 106 S.Ct. at 2513. The Court's role on summary judgment, however, is not to weigh the evidence (issue resolution), but rather it is issue finding. *Id.*

The recent Ninth Circuit decision in *Prescott v. United States,*[4] establishes that the plaintiff bears the initial burden of pleading matters that do not clearly fall within the exceptions of § 2680. *Id.* at 701. After plaintiff satisfies this burden, defendant must prove the applicability of one of the exceptions to the FTCA's general waiver of immunity. *Id.* at 702. On this motion for summary judgment, therefore, the United States must establish that no genuine issue of material fact remains for trial with respect to the discretionary function exception.

## III

## DISCUSSION

The FTCA waives sovereign immunity and subjects the United States to tort liability to the same extent as a private person under similar circumstances. 28 U.S.C. § 2674; *Seyler v. United States,* 832 F.2d 120 (9th Cir.1987). Under 28 U.S.C. § 2680(a), however, the United States retains immunity for torts committed in the exercise of discretionary functions. The discretionary function exception reestablishes immunity against

> any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an

---

4. 973 F.2d 696, 703 (1992).

employee of the Government, whether or not the discretion involved be abused. 28 U.S.C. § 2680(a).

This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988) (quoting *United States v. S.A. Empresa De Viacao Aerea Rio Grandense*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2761–2762, 81 L.Ed.2d 660 (1984) (*Varig Airlines*)).

To come within the exception, the challenged actions must satisfy two criteria. First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" *United States v. Gaubert*, ⸺ U.S. ⸺, ⸺, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)); citing *Dalehite v. United States*, 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953). Second, the conduct must be "based on considerations of public policy." *Id.* ⸺ U.S. ⸺, 111 S.Ct. at 1274 (quoting *Berkovitz*, 486 U.S. at 537, 108 S.Ct. at 1959).

In defining the first criterion, the Supreme Court has noted that the "exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Gaubert, supra* ⸺ U.S. at ⸺, 111 S.Ct. at 1273 (citing *Berkovitz, supra* at 536, 108 S.Ct. at 1958). Under these circumstances, the employee does not retain discretion but rather must "adhere to the directive." *Id.* So, for example, in *Berkovitz*, the Supreme Court held the exception inapplicable to a negligent failure to test a polio vaccine because the agency had adopted a specific policy mandating the testing of all vaccines prior to distribution. *Berkovitz, supra* at 547, 108 S.Ct. at 1964. The court concluded that if plaintiff could prove that "the Bureau's policy did not allow the official who took the challenged action to release a noncomplying lot on the basis of policy considerations—the discretionary function does not bar the claim." *Id.*

If the challenged action is not barred by a federal statute, regulation, or policy, the court must then determine if that decision is "based on considerations of public policy." *Berkovitz, supra* 486 U.S. at 537, 108 S.Ct. at 1959. The discretionary function exception was designed to "'prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id.* (citing *Varig Airlines, supra* 467 U.S. at 814, 104 S.Ct. at 2764–2765).

In *Varig Airlines*, victims of airplane accidents alleged that the Federal Aviation Administration (FAA) negligently failed to properly inspect airplanes. The Court noted that the statutory and regulatory scheme gave the Secretary of Transportation broad authority in designing and implementing safety standards. The Secretary was immune because the system of "spot checking" was an effort to "accommodate the goal of air transportation safety and the reality of finite agency resources." 467 U.S. at 820, 104 S.Ct. at 2767–2768. The Court further applied the exception to FAA employees in executing the "spot check" program because the employees

> were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be place in a given manufacturer, the need to maximize compliance with FAA regulations, and the efficient allocation of agency resources.

*Id.* (*Compare Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955)) (Once maintenance undertaken, failure to maintain lighthouse did not involve any permissible exercise of policy judgment).

█ Plaintiffs allege that various firefighters committed a total of sixteen negligent acts (Plfs. Opp. at 60–61). Deleting repetitious allegations, plaintiffs challenge 1) Disney's failure to arrive at the fire site in a timely manner; 2) Disney's failure to

use his radio to locate additional resources; 3) Disney's departure from the fire leaving only three inexperienced crewmen; 4) Disney's failure to return to the firesite with Cashman; 5) Disney's failure to properly transfer authority and instruct Cashman; 6) Disney's failure to secure adequate resources to contain the fire; 7) Defendant's failure to implement a strategy to properly fight the Hamm Fire; 8) Defendant's failure to utilize heavy equipment to cut firelines; 9) Defendant's failure to prepare for extreme fire conditions; 10) Defendant's inadequate communications system during the fire; 11) Defendant's implementation of backfires.[5]

In an attempt to avoid the application of the discretionary function exception to these acts and omissions, plaintiffs contend 1) Defendant's regulations prohibit these actions (Plfs. Opp. at 76 and 82 citing 36 CFR 261.5 pp. 332–335 and Forest Service Manual § 5130.41–3); 2) California caselaw concerning negligence in fire control; 3) Firefighting guidelines discussed by plaintiffs' experts Loren Lucore and Ellis Severietti.

As defendant notes, plaintiffs' experts have not identified any "federal statute, regulation, or policy [which] specifically prescribes a course of action for an employee to follow." *Gaubert, supra* —— U.S. at ——, 111 S.Ct. at 1273. Rather, the experts make only general references to "Forest Service policy." The plaintiffs' experts do not offer the kind of *"specific* and *mandatory* regulation or statute [or policy] which creates clear duties incumbent upon the governmental actors." *Kennewick Irr. Dist. v. U.S.,* 880 F.2d 1018, 1026 (9th Cir.1989) (emphasis original).

Plaintiffs also cannot avoid the exception by citations to California caselaw concerning negligence in other fire control situations. As the Ninth Circuit has noted, "negligence is simply irrelevant to the discretionary function inquiry" because § 2680(a) offers immunity "whether or not the discretion involved be abused."

*Kennewick, supra* at 1029 (citing 28 U.S.C. § 2680(a); *Mitchell v. United States,* 787 F.2d 466, 468 (9th Cir.1986)). "If the presence of negligence were allowed to defeat the discretionary function exception, the exception would provide a meager shield indeed against tort liability." *Kennewick, supra* at 1029.

The remaining statutory and regulatory guidelines do not aid plaintiffs in establishing that defendant violated a mandatory directive. The regulations cited by plaintiffs at 36 CFR 261.5 pp. 332–335 prohibit

(a) Carelessly or negligently throwing or placing any ignited substance or other substance that may cause a fire.

(b) Firing any tracer bullet or incendiary ammunition.

(c) Causing timber, trees, slash brush or grass to burn except as authorized by permit.

(d) Leaving a fire without completely extinguishing it.

(e) Allowing a fire to escape from control.

(f) Building, attending, maintaining, or using a campfire without removing all flammable material from around the campfire adequate to prevent its escape.

Plaintiffs neglected to include subsection (f) in their quotation of this regulation, thereby avoiding the reference to "campfires." Taken together with the others, it is obvious that these regulations apply to civilian visitors to the National Parks, not National Forest Service firefighters. Applying these rules to firefighters would create absurd results. For example, § (c) would require that a Forest Service firefighter obtain a permit (defined as oral authorization from a Forest Service employee 38 CFR 261.2) to light burnouts while combatting a fire. Application of § (d) would bar any firefighter from moving from one fire to another without fully extinguishing the first fire, regardless of resource allocation or safety concerns. Enforcement of § (e) would subject any firefighter overwhelmed by a wildland fire to

---

**5.** Defendant contends that the Forest Service lit burnouts on plaintiffs' property, not backfires. A backfire starts a large fire moving towards the fire under attack while a burnout merely scorches the earth along a limited fireline.

liability for "allowing a fire to escape from control." [6] These rules, which govern National Forest users, cannot constitute "directives" in this case because they cannot reasonably be construed as binding upon the relevant actors, i.e., federal firefighters.

Plaintiffs also rely upon Forest Service Manual § 5130.41–3 which reads "The responsible line officer, or the designated fire boss/incident commander, shall ensure that each wildfire is out before it is abandoned." (Def. Exh. D) As defendant points out, Jerry Disney did not "abandon" the fire but rather went to get more help while leaving a three man crew to continue establishing a fireline. The cited portion of the Manual did not mandate that a firefighter never depart from the scene of a fire so Disney's effort to personally obtain support did not violate a specific, mandatory directive.

Plaintiffs' failure to cite an applicable mandatory directive establishes that the challenged actions involved judgment or choice and were, in fact, discretionary acts. It remains to be determined if these decisions were "grounded in social, economic, and political policy." *Gaubert, supra* — U.S. at ——, 111 S.Ct. at 1273. Such an analysis "is directed at the nature of the conduct, and does not require an analysis of the decision-making process." *In re Consolidated United States Atmospheric Testing Litigation,* 820 F.2d 982 (9th Cir. 1987) *cert. denied,* 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988); *Kennewick,* 880 F.2d 1018, 1028 (9th Cir.1989). The court need not consider whether defendant actually made a conscious decision balancing social, economic or political factors. If the relevant decision "is within the discretionary function exception, then logically the failure to consider whether [to make the decision] necessarily falls within the exception as well." *Kennewick, supra* at 1028 (quoting *In re Consolidated United States Atmospheric Testing Litigation, supra* at 998–99).

*Statutes and Regulations Relevant to Fire Suppression*

If defendant can submit a statute or regulation that permits the exercise of discretion, then the government employees acting pursuant to that regulation are presumptively protected by from tort liability. As the Supreme Court recently noted in *Gaubert v. United States,* —— U.S. at ——, ——, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335 (1991)

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.

The policy of the Forest Service concerning suppression of wildfires is generally reflected in the Forest Service Manual ("Manual" or "FSM") and the Forest Service Handbook. Declaration of Allan J. West ¶ 3. Title 5100 of the Manual relates broadly to "Fire Management," including information on "planned ignitions," defined as fires started by a scheduled, deliberate management action, "prescribed fires," defined as fires burning under preplanned, specified conditions to accomplish specific preplanned objectives, and "unplanned ignitions," such as the Hamm fire, which are fires started at random by either natural or human causes. FSM at § 5105(12, 13, 15).

Under § 5102—"Objectives," the Manual states "[t]o provide a cost efficient level of wildfire protection on National Forest System lands commensurate with the threat to life and property, and the potential for loss based on hazard, risk, values, and management objectives." FSM at § 5102(2)

Under § 5105—"Definitions," an "Appropriate Suppression Response" is defined as

---

**6.** Plaintiffs' own expert conceded that during his experience as a firefighter, fires have escaped his control. (Severietti Dep. at 108:7–9).

[t]he planned strategy for suppression action (in terms of kind, amount, and timing) on a wildfire which most efficiently meets fire management direction under current and expected burning conditions. The response may range from a strategy of prompt control to one of containment or confinement. FSM at § 5105(1).

Chapter 5130 of Title 5100 of the FSM relates specifically to "Fire Suppression." Section 5130.2—"Objective" states that "[t]he objective of fire suppression is to suppress wildfires at minimum cost consistent with land and resource management objectives and fire management direction." FSM at § 5130.2. Under § 5130.3 "Policy," the FSM states "Respond to each wildfire ignition in a timely manner with appropriate forces, based upon established fire management direction and cost efficiency." FSM at § 5130.3.

Section 5131 states that initial suppression action be planned "to provide for the most reasonable probability of minimizing the sum of fire suppression costs plus resource damages, consistent with probable fire behavior, potential resource impacts, safety, and smoke management considerations." FSM at § 5131(2).

Section 5132 of the Manual, relating to "Escaped Fires," states that "[a]n escaped fire situation analysis is a decision making process" that requires identification of:

criteria used to evaluate suppression alternatives. The criteria shall reflect land and resource management objectives (including environmental, political, and social concerns), potential suppressions costs and resource damages....

FSM at § 5132.1(1).

The FSM incorporates by reference the Forest Service Handbook ("FSH") and the Fireline Handbook of the National Wildfire Coordinating Group in Washington, D.C. The Manual notes that the Fireline Handbook helps fire suppression personnel to "size up a wildfire situation," and "evaluate alternative courses of action." FSM at § 5109.32. Accordingly, pursuant to Forest Service policy, specific strategy and resource decisions regarding how a particular fire will be fought are left to the discretion of the Incident Commander. West Dec. ¶ 5, 6, 7, In evaluating alternative courses of action, establishing priorities and assigning government personnel and equipment, an Incident Commander must make social and economic policy decisions, such as balancing the threat to human lives (including the risk to crew safety) against the threat to private homes and other structures, and natural resources.

*Disney's Initial Attack Is Immune Under the Exception* [7]

The Forest Service Manual expressly provides that "[t]he Incident Commander is responsible for incident activities including the development and implementation of strategic decisions...." FSH § 5109.32.-31.1 In conjunction with the other directives of the FSH, the Incident Commander has been given discretion during fire suppression. Disney had been given broad discretion to implement strategic decisions so "it must be presumed that [Disney's] acts are grounded in policy when exercising that discretion." *Gaubert, supra* — U.S. at ——, 111 S.Ct. at 1274.

Each of the decisions attacked by plaintiffs involved policy judgments within the meaning of the discretionary function exception.[8] Disney was not only Incident Commander but also the Assistant District Fire Management Officer for the entire Groveland District which was suffering from at least 19 other lightning fires at the time of the Hamm fire. After failing to

---

**7.** This discussion includes the first six of plaintiffs' allegations: 1) Disney's failure to arrive at the firesite in a timely manner; 2) Disney's failure to use his radio to locate additional resources; 3) Disney's departure from the fire leaving only three inexperienced crewmen; 4) Disney's failure to return to the firesite with Cashman; 5) Disney's failure to properly transfer authority and instruct Cashman; 6) Disney's failure to secure adequate resources to contain the fire.

**8.** The court does not address Disney's alleged delay in arriving at the fire because plaintiffs' experts have conceded that, given the difficult terrain, they could not find fault with Disney's failure to arrive earlier. Severietti Dep. at 87:19–23 and 91:2–8; Lucore Dep. at 23:12–24:7.

reach the station via radio, Disney chose to personally return to the station to obtain help. Disney did not return to the Hamm fire due to other responsibilities for planning throughout the District. Though Disney did not explicitly transfer authority to Cashman, he did escort Cashman back to the site of the fire. None of these decisions were barred by an explicit, mandatory directive. In fact, the FSH manual gave Disney broad discretion to implement strategic decisions which impliedly authorized decisions concerning the need for more support, the need for his presence at other planning meetings, and the need for communication of authority.

*Defendant's Preparation for Fire and Allocation of Resources Are Immune* [9]

Again, plaintiffs have not alleged that defendant's actions violated any specific, mandatory directives so the challenged actions are discretionary within the meaning of the exception. Defendant has also cited regulations that grant the National Forest Service discretion to implement strategies of fire suppression, including "approving and ordering and releasing of resources." FSH § 5109.32.31.1 This regulation impliedly authorizes utilization of equipment, preparation for conditions, and establishment of communications. This grant of discretion again creates a presumption that the defendant's actions exercising that discretion were grounded in policy. Like the FAA employees in *Varig Airlines,* the National Forest Service employees "were specifically empowered to make policy judgments" regarding "the efficient allocation of agency resources." *Varig Airlines, supra* at 820, 104 S.Ct. at 2768. *See also, Coe v. United States,* 502, F.Supp. 881, 886 (D.Or.1980) (Allocation of resources during fire suppression falls within discretionary function exception).

*Defendant's Implementation of Backfires is Immune*

The decision to set a burnout fire to stop an advancing wildland fire involved the exercise of judgment. Plaintiffs have not identified any applicable prohibition of such action. As defendant notes, Title 5100 of the Manual discusses "planned ignitions," defined as fires started by a scheduled, deliberate management action and "prescribed fires," defined as fires burning under preplanned, specified conditions to accomplish specific preplanned objectives. FSM at § 5105(12, 13, 15).[10] Plaintiffs face a presumption that Officer New's acts were grounded in "established governmental policy, as expressed or implied by statute, regulation, or agency guidelines." *Gaubert, supra* — U.S. at ——, 111 S.Ct. at 1274.

In *Kennewick,* the Ninth Circuit held that a decision whether or not a government engineer removes "unsuitable materials" involves discretion but concerns a technological determination, not involving concerns of a social, economic or political nature. The burnout decision similarly involved technical considerations, but also involved a weighing of the value of plaintiffs' property relative to the danger of allowing the fire to advance further, a matter of judgment and choice.

In addressing the nature of decisions made during the supervision of a Savings and Loan, the Supreme Court confronted a similar question when challenged actions involve both technical and policy judgments. The Court concluded

> Gaubert also argues that the challenged actions fall outside the discretionary function exception because they involved the mere application of technical skills and business expertise. But this is just another way of saying that the considerations involving the day-to-day manage-

---

**9.** This category refers to plaintiffs' next four allegations: 7) Defendant's failure to implement a strategy to properly fight the Hamm Fire; 8) Defendant's failure to utilize heavy equipment to cut firelines; 9) Defendant's failure to prepare for extreme fire conditions; 10) Defendant's inadequate communications system during the fire.

**10.** A person shall not set a backfire, or cause a backfire to be set, except under the direct supervision or permission of a state or federal forest officer, unless it can be established that the setting of such backfire was necessary for the purpose of saving life or valuable property.

ment of a business concern such as IASA are so precisely formulated that decisions at the operational level never involve the exercise of discretion within the meaning of § 2680(a), a notion that we have already rejected in disapproving the rationale of the Court of Appeals' decision. It may be that certain decisions resting on mathematical calculations, for example, involve no choice or judgment in carrying out the calculations but the regulatory acts alleged here are not of that genre. Rather it is plain to us that each of the challenged actions involved the exercise of choice and judgment.

*Gaubert, supra* —— U.S. at ——, 111 S.Ct. at 1278.

In the present case, the decision to attempt a burnout involved both technical considerations at the operational level and the implementation of discretionary regulatory efforts. Under such circumstances, the immunity of the government under § 2680(a) remains intact.

In *Defrees v. United States*, plaintiffs sued the National Forest Service for the alleged negligence of firefighters in combating a wildland fire that destroyed plaintiffs' property. 738 F.Supp. 380 (D.Or. 1990). Like the firefighters in this case, the firefighters in *Defrees* faced a number of simultaneous fires. Like defendant in this case, defendants in *Defrees* deployed only a three-person crew to attack the fire at issue which, given high winds, proved inadequate. As in this case, other fires had been assigned a higher priority than the fire at issue. The court concluded that the discretionary function exception barred liability because

> In establishing priorities, assigning government personnel and equipment, and deciding what private resources, if any should be used, these employees were required to make social and economic policy decisions. They were required to balance the value of communications installations, private homes, endangered species, and other resources.

*Id.* at 385.

Like the defendants in *Defrees*, the National Forest Service firefighters in this case

balanced social and economic values in attempting to minimize damage from numerous fires. The decisions made during this process are similarly protected by the discretionary function exception.

Like plaintiffs in this case, plaintiffs in *Defrees* attempted to avoid the discretionary function exception by reference to *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) in which the Supreme Court concluded that the United States could be liable for the Forest Service's negligence in fighting a forest fire. The *Rayonier* Court, however, did not address the discretionary function exception but instead rejected the argument that the United States must be immune whenever a local government performing a "uniquely governmental" function would be immune. After citing the FTCA, the Court concluded that

> These provisions, given their plain meaning, make the United States liable to petitioners for the Forest Service's negligence in fighting the forest fire if, as alleged in the complaints, Washington law would impose liability on private persons or corporations under similar circumstances.

352 U.S. 315, 318, 77 S.Ct. 374, 376

The combination of the Court's silence as to the discretionary function exception and the distinguishable facts faced by the Court make *Rayonier* inapplicable to the present case. In *Rayonier*, the United States permitted a railroad to pass through government land in Washington State. Sparks ignited flammable materials which the government had "negligently allowed" to accumulate near the tracks. Within 5 days, the fire was under control but the government allowed certain locations to burn and smolder from August 11 until September 20. During this extended period, "there were men, equipment and a plentiful supply of water available." *Rayonier, supra* at 316, 77 S.Ct. at 375. On September 20, wind helped the fire regain force and eventually destroy plaintiffs' property.

In the present case, plaintiffs have not alleged that the United States contributed to the hazard by either introducing ignition or permitting the accumulation of hazardous materials.[11] While plaintiffs have alleged that defendant did not fully utilize all available resources, plaintiffs do not dispute that numerous other fires, of higher priority than the Hamm fire, required attention. Finally, and "[m]ore importantly, the Forest Service did not stand idly by, allowing the [Hamm] Fire to calmly smolder for weeks before it suddenly exploded onto plaintiffs' property." *Defrees, supra* at 384–385.

The discretionary function exception applies to all of plaintiffs' claims against the National Forest Service firefighters. Plaintiffs may not invoke the FTCA in this suit. The court, therefore, lacks subject matter jurisdiction and does not address defendant's claims concerning substantive California law.

### IV

### CONCLUSION

Plaintiffs have not submitted specific statutory or regulatory directives mandating particular actions during the fighting of the Hamm wildland fire. The decisions by the firefighters were therefore discretionary. Defendant has submitted relevant regulations and guidelines that expressly and impliedly granted National Forest Service firefighters discretion during fire suppression activities. This grant of discretion creates a presumption that government employees acting pursuant to these rules were making decisions based on social, economic or political policy. The challenged actions are protected by the discretionary function exception and defendant may not be held liable for these claims under the Federal Tort Claims Act.

For the foregoing reasons, defendant's motion for summary judgment will be HEREBY GRANTED. This opinion will,

to the extent applicable, constitute findings of fact and conclusions of law.

---

**11.** To the contrary, the defendant has submitted undisputed evidence that plaintiffs allowed cut wood to remain on their property which contributed to the spread of the Hamm fire.