**Ellen L. DEFREES, A. Lyle Defrees
and Lowell K. Defrees, Plaintiffs,**

v.

**UNITED STATES of America, Acting
through the UNITED STATES
FOREST SERVICE, Defendant.**

No. 88–868 RE.

United States District Court,
D. Oregon.

April 10, 1990.

Robert J. Neuberger, Pozzi, Wilson, Atchison, O'Leary & Conboy, Portland, Or., A.J. Schmeits, Baker, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Dist. of Oregon, James L. Sutherland, Asst. U.S. Atty., Eugene, Or., for defendant.

## OPINION

REDDEN, District Judge.

Plaintiffs Ellen, Lyle, and Lowell Defrees bring this action under the Federal Tort Claims Act alleging that defendant United States Forest Service negligently failed to suppress a forest fire that damaged their property. The parties agreed to bifurcate trial of liability and damages. The liability phase was tried to the court on March 27 and 28, 1990. I find that defendant is not liable for plaintiffs' damages.

## BACKGROUND

Plaintiffs own land adjacent to Forest Service land within the Burnt Powder Fire Zone of the Wallowa–Whitman National Forest, near Baker, Oregon. Between 2:00 and 4:00 p.m. on Saturday, August 2, 1986, unpredicted dry thunderstorms passed through Eastern Oregon, starting twenty to thirty fires in the Burnt Powder Fire Zone. Because numerous fires also started in other parts of the Wallow–Whitman National Forest and on an adjacent National Forest, there was competition for fire suppression resources in the area.

One of the fires in the Burnt Powder Fire Zone, referred to as "incident 31" and later named the Huckleberry Fire, is the subject of this litigation. The Huckleberry Fire started more than three miles to the west of plaintiffs' property. Two roads and Huckleberry Ridge, a natural fire break, separate plaintiffs' property from the point where Huckleberry Fire started.

With the exception of incidents 41 and 42, known as the Coronet Fire, on August 2 the Forest Service assigned personnel and equipment to all the fires it had located that started in the Burnt Powder Fire Zone. A three-person crew, supervised by Robert DeMastus, who was experienced in forest fire suppression, arrived at the Huckleberry Fire at about 5:00 p.m. When the crew arrived, the fire was between one and two acres. DeMastus and his crew, which included Bill Mitchell, also experienced in fire suppression, dug an 18 to 24 inch wide line around the fire. The crew suppressed the open flames, felled the trees near the line that could have allowed the fire to easily escape containment, and moved flammable debris to the center of the burn. Before leaving the fire, the crew began mopping up the fire, working from the fire line toward the center of the burned area. When the crew left the fire at approximately 8:15 p.m., there were no visible flames or columns of smoke.

Upon returning to the Baker Ranger Station, DeMastus informed Steven Culp, the dispatcher, that the fire needed to be checked the next morning. Fire suppression officers intended at that time to send DeMastus and his crew back to check the Huckleberry Fire the next morning.

Overnight, fire control managers changed the plan to send DeMastus and his crew back to the Huckleberry Fire on August 3 in response to the changing fire situation and reassessment of fire suppression priorities. During the night, a suppression crew lost containment of the Dark Canyon Fire, which first threatened a communications complex on which the Forest Service depended, and then headed toward private homes. The fires burning in the Cottonwood/Sunflower area were closer to private property than was the Huckleberry Fire. These fires were thought to pose a higher risk of spreading because of thinning slash in the area. The Eagle Fire endangered a bald eagle sanctuary. The Coronet Fire had not been manned. These fires, along with the Blue Canyon Fire, were assigned higher priority than the Huckleberry Fire.

On Sunday morning, August 3, fire control supervisors sent DeMastus and a small crew to the Coronet Fire. Unpredicted, gusty and erratic winds blew that fire out of control around noon. The winds blew spot fires up to a half-mile from the fire, and the main fire grew from about 10 acres to more than 100 acres in a few hours.

Bill Mitchell and a crew were sent to the Sunflower/Cottonwood area to fight unmanned fires reported there. Mitchell's crew was diverted to the Blue Canyon Fire. Late in the morning, from a high point in the Sunflower/Cottonwood area, Mitchell saw that strong, erratic winds were quickly spreading several fires, including the Huckleberry Fire. Mitchell reported his observations to the dispatcher, and was sent to the Huckleberry Fire.

By early afternoon, the Huckleberry Fire was burning in tree crowns, and strong, gusting winds were blowing spot fires at least ¼ mile ahead of the main fire. Mitchell requested suppression crews and supplies, including retardant drops from tanker planes. Because many fires were out of control and spreading rapidly, the Forest Service could not provide all the resources Mitchell requested.

At about 3:00 p.m., 18 smokejumpers arrived and began working on the fire. Despite their efforts and the work of two caterpillar tractors, the fire grew to approximately 400 acres that afternoon. More fire suppression personnel and equipment continued to arrive throughout the evening.

The next morning, August 4, Huckleberry Fire appeared to stop spreading. That afternoon, however, erratic winds again picked up, spreading the fire to the east/southeast. The fire again spread quickly, with spot fires blown ¼ to ½ miles in front of the main fire. By that evening, the fire approached the ridge line on Huckleberry Ridge, and moved onto the southwest corner of plaintiffs' property. At about 4:20 p.m., plaintiff Lyle Defrees informed the Forest Service dispatcher in Baker that the fire was approaching on a large front, and had entered his property. He said that he wanted to coordinate his efforts with those of the Forest Service, and requested instructions. His son, Dean Defrees, built a fire line along the western boundary of plaintiffs' property with a caterpillar tractor.

The next morning, August 5, Lyle and Dean Defrees continued building fire lines. The fire spotted over a Forest Service road and the line Dean Defrees had built the evening before, and continued to spread to the east. It crossed the southern portion of plaintiffs' property between 1:00 and 5:00 p.m. that afternoon. Plaintiffs backburned into the northern flank of the fire from a road running east to west across their property. Several dozen of plaintiffs' friends and neighbors helped fight the fire on August 5. The northern spread of the fire was stopped after burning several hundred acres of plaintiffs' property. The Forest Service was unable to place crews and equipment along the north flank of the fire until the next day.

In each of its contracts for logging operations and related road maintenance, the Forest Service requires contractors to assume responsibility for initial attack on fires the contractor discovers within a certain distance of the contract site. The contractors are responsible for suppression until the Forest Service assumes responsibility. Contractors are also required to supply personnel and equipment for fire suppression outside the contract area at the Forest Service's request. They are required to impose these requirements upon any subcontractors they hire.

The Forest Service keeps lists of the type and location of contractors' equipment which might be requisitioned for fire suppression. The equipment must generally be inspected before assigned to fire suppression. Equipment which is inspected early in the year must generally be re-inspected before being assigned to fire suppression later in the season.

Forest Service policy generally requires that all personnel used by the Forest Service in fire suppression must be properly trained and equipped, and must pass a physical fitness test. Though the Forest Service may assign personnel who have not

met this requirement in emergencies, in the interest of safety, the Forest Service rarely assigns persons who have not met these requirements to fire suppression.

On Sunday morning, August 3, the Forest Service asked Ellingson Lumber Company to provide a twenty-man crew for the Dark Canyon fire. Gary Johnson, a supervisor working for Ellingson, called employees of contractors and subcontractors in an effort to put together a crew. Many of those recruited did not pass the physical test, and Ellingson was able to send only a six-man crew to the fire. The company also provided heavy equipment requested by the Forest Service.

Contractors working for Ellingson had equipment near the origin of the Huckleberry Fire. H & L Construction Company, which was building roads in the area, had two fire pumpers and a 4,000 gallon water tanker nearby. Gary Smith, who subcontracted road construction for H & L, had five belly dumps and two 4,000 gallon fuel tankers in the area. Ellingson Lumber Company had other equipment, including a 4,000 gallon water tanker, two graders, a front-end loader, and a fuel tanker in the area.

On the evening of August 2, Smith telephoned Steven Culp of the Baker Dispatch Office. Smith informed Culp that he had equipment in the area, and mentioned the caterpillar tractor. Smith, who was primarily concerned with the safety of his equipment, did not specify what other equipment was in the area or offer the use of his equipment or employees. Culp told Smith that the fire had been lined.

On the morning of August 3, Lee Wilson, one of Smith's drivers, went to the pit near the fire where Smith's equipment was kept to level a fuel truck. He saw much smoke coming from the Huckleberry Fire, and called Smith by radio to report that the fire was out of control. Smith called Howard Logsdon, owner of H & L Construction. Those two, along with Wilson and other employees, were occupied for some time moving equipment out of the path of the fire. They saw Mitchell near the fire during the afternoon. He advised them to move their equipment. At trial, Smith testified that that was good advice.

## DISCUSSION

Plaintiffs' complaint includes claims of common law negligence, negligence per se, and statutory liability. Plaintiffs' negligence per se and statutory liability claims are based on alleged violations of ORS 477.066(1) and ORS 477.740(1)(d). Under ORS 477.066(1)

> each owner and operator of forest land on which a fire exists or form which it may have spread, notwithstanding the origin or subsequent spread thereof, shall immediately proceed to control and extinguish such fire when its existence comes to the knowledge of the owner or operator, without awaiting instructions from the forester, and shall continue until the fire is extinguished.

A person commits the crime of unlawful use of fire under ORS 477.740(1)(d) if

> having knowledge of a fire burning on the persons' land, or land which the person is in possession or control, fails or neglects to make every reasonable effort to extinguish the same, regardless of whether or not the person is responsible for the starting or existence thereof.

At trial, plaintiffs conceded that the negligence per se and statutory liability claims are essentially a single claim asserting per se negligence based on a statutory violation.

Under their common law negligence claim, plaintiffs assert that the Forest Service negligently failed to suppress the Huckleberry Fire and to control its spread onto their property. They also assert that the Forest Service negligently failed to coordinate its fire suppression efforts with them or to warn them of the approach of the fire. At trial, plaintiffs were particularly critical of the Forest Service's failure to check the Huckleberry Fire on the morning of August 3 and its failure to organize private crews and equipment for use in fire suppression.

Plaintiffs' negligence per se claim asserts that the Forest Service is liable for

failing to immediately proceed to control and extinguish a fire on Forest Service land. Plaintiffs do not contend that Oregon statutes impose strict liability for failure to suppress fires. Instead, they note that the statute defines the reasonable efforts an owner or operator must use to suppress a fire as requiring assignment of "available personnel and equipment" under the owner or operator's "supervision and control." Plaintiffs contend that, because the Forest Service can requisition private personnel and equipment, those resources are effectively under the Forest Service's control.

Defendant asserts that this court lacks jurisdiction over this case because the government has not waived immunity, under the Federal Tort Claims Act, for liability for torts committed while carrying out discretionary functions. It further contends that, even if the discretionary immunity exception does not apply, it exercised due care and violated no statutes in suppressing the Huckleberry Fire.

## 1. Discretionary Function Immunity

■ Under the waiver of sovereign immunity established in the Federal Tort Claims Act, the United States assumed responsibility for torts to the same extent a private person would be liable under similar circumstances. 28 U.S.C. Section 2674; *Seyler v. United States*, 832 F.2d 120, 121 (9th Cir.1987). Under U.S.C. Section 2680(a), however, the United States retained immunity from liability for torts committed in the exercise of discretionary functions.

Plaintiffs cite *Rayonier, Inc. v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957) in support of their contention that discretionary function immunity does not apply in this case. In *Rayonier*, the Court concluded that the United States would be liable for the Forest Service's negligence in fighting a forest fire if, under applicable state law, a private person or corporation would be liable under similar circumstances. *Id.* at 318, 77 S.Ct. at 376.

Though at first glance *Rayonier* appears to establish that discretionary function immunity does not apply to the government's efforts to suppress forest fires, the issue is not that simple. The *Rayonier* Court made no mention of discretionary function immunity, but based its decision on a rejection of the proposition that the United States would be immune if a local government, acting in the "uniquely governmental" capacity of public fireman, would be immune in similar circumstances. *Id.* at 319, 77 S.Ct. at 376.

The Court's silence on issue of discretionary function immunity could indicate its conclusion that suppression of fires for which the Forest Service is responsible is simply not a discretionary function. That silence could also reflect the Court's conclusion that, under the *particular* facts of *Rayonier*, the Forest Service was performing a non-discretionary function.

Given the Court's summary of the allegations of the complaint, I conclude that the later interpretation is more likely. The Court noted that the plaintiff landowners alleged that they were aware and relied on the Forest Service's agreement with the State of Washington obligating it to suppress any fires in the area that included plaintiffs' lands. The plaintiffs alleged that the fire started in material that the Forest Service had negligently allowed to accumulate. The plaintiffs also alleged that, though it had ample personnel and equipment available to extinguish a fire that it had brought under control, the Forest Service allowed the fire to smolder for nearly forty days before strong winds spread it over a wide area. The *Rayonier* Court apparently concluded that, under the facts as alleged, the Forest Service had no choice but to fully extinguish the fire before it was blown onto plaintiffs' property.

The facts established at trial in the present case were vastly different from those alleged in *Rayonier*. Here, the Forest Service had not negligently allowed flammable materials to accumulate. After strong winds pushed the several fires out of control on August 3, it did not have an abundance of personnel and equipment for fire suppression. More importantly, the Forest Service did not stand idly by, allow-

ing the Huckleberry Fire to calmly smolder for weeks before it suddenly exploded onto plaintiffs' property.

■ Under the facts of the present case, I find the discussion of discretionary function immunity in *Arizona Maintenance Co. v. United States*, 864 F.2d 1497 (1989) more persuasive than the silence on the subject in *Rayonier*. Summarizing recent United States Supreme Court analysis of discretionary function immunity, the *Arizona* court described the determination of whether that exception applies in specific fact situations as a two-part process. *Id.* 864 F.2d at 1502. In the first step, courts examine the nature of the challenged conduct and consider whether there was an element of choice in the government employee's action. *Id.* If the employee had no choice, there is no immunity. *Id.* If the action involved some discretion, the court must go a step further to determine whether the exercise of that discretion is grounded in the social, economic, and political policies that the discretionary function exception was designed to protect. *Id.*

In the present case, Forest Service employees responsible for suppressing the rash of fires that started on August 2 and were blown out of control on August 3 had considerable discretion in deciding how to allocate suppression resources. In establishing priorities, assigning government personnel and equipment, and deciding what private resources, if any, should be used, these employees were required to make social and economic policy decisions. They were required to balance the value of communications installations, private homes, endangered species, and other resources. I conclude that these decisions are subject to discretionary function immunity.

### 2. Common Law Negligence

■ I conclude that discretionary function immunity applies to this case. A contrary conclusion would not change the outcome, however, because I also find that the Forest Service was not negligent. Faced with serious challenges on August 2 when the Huckleberry Fire started and a full

crisis on August 3, when that and several other fires blew up, the Forest Service made choices that, even with the benefit of hindsight, were reasonable. Initial attack on the Huckleberry Fire cannot be faulted. Given the considerable distance between the origin of that fire and plaintiffs' property, and the placement of roads and a large ridge that would normally serve as fire breaks, it was not foreseeable that the Huckleberry Fire would burn onto plaintiffs' property.

With limited resources to devote to many fires, the Forest Service had to establish suppression priorities. The priorities it set, allocating resources first to fires more immediately threatening private homes, communications facilities, and endangered species, were intelligent. With no prediction of the erratic winds that would blow several fires out of control on August 3, it was reasonable both to bring in DeMastus and his crew after the Huckleberry Fire was fully lined and partially mopped up on August 2, and to send that crew to fight unmanned fires the next morning. At trial everyone agreed that, under normal circumstances, the Forest Service would have sent a crew back to the Huckleberry Fire the next morning. No one could dispute, however, that this was not a normal situation.

I find that, even if a small crew had returned to the Huckleberry Fire on August 3, it is unlikely that the fire would have been contained. Credible expert testimony established that a small crew probably would not have been able to mop-up enough of the fire to prevent its spread when the high winds came up.

I also find that the Forest Service's decisions concerning the use of private personnel and resources were reasonable. When the Forest Service asked Ellingson to provide fire fighters on August 3, only six of the more than twenty prospective workers who arrived could be used. In any event, because any additional personnel would not have been sent to the Huckleberry Fire on the morning of August 3, recruitment of more private crews would not have changed the outcome of that fire. Though

the Forest Service could have temporarily used the workers who lacked appropriate fitness and training in the emergency facing it on August 3rd, 4th, and 5th, safety concerns made it reasonable not to do so.

By the time Smith called the dispatcher on the night of August 2, a Forest Service crew had suppressed the Huckleberry Fire. Smith's equipment would have been of little use in mopping up the fire that night. The large tankers would not have been able to get close enough to supply water.

I likewise find that the decision not to requisition private equipment in the area of the Huckleberry Fire on August 3 was not negligent. Most of the equipment in the area was not suitable for fighting forest fires. The other private equipment that might normally have been useful would not have appreciably helped to fight the Huckleberry Fire anyway. When the fire expanded, it moved very quickly and spotted across any lines that could be built. Under those conditions, use of a few more pieces of private equipment would have made little difference.

Plaintiffs' contention that the Forest Service was negligent in not adequately coordinating its suppression efforts with them also fails. Given the number of large fires and the speed of their advancement, communication and coordination was extremely difficult. Negligence must be evaluated with regard to the circumstances. Under the circumstances, the Forest Service did as well as reasonably could have been expected.

*3. Negligence Per Se*

 I agree with the parties' conclusion that the Oregon statutes requiring owners and operators to suppress forest fires do not impose strict liability, but require the exercise of reasonable suppression efforts. Because I conclude that the Forest Service made every reasonable effort to suppress the Huckleberry Fire before it damaged plaintiffs' land, I find that defendants did not violate the applicable statutes.

In any event, under the doctrine of negligence per se, violation of a statute raises a rebuttable presumption of negligence. *Gattman v. Favro*, 86 Or.App. 227, 232, 739 P.2d 572 (1987), *rev'd in part on other grounds*, 306 Or. 11, 757 P.2d 402 (1988). Even if the Forest Service had violated the statutory requirements, the facts established at trial rebut any presumption that it was negligent.

### CONCLUSION

Defendant is not liable for any of plaintiffs' damages. This opinion is my findings of fact and conclusions of law. Fed.R. Civ.P. 52(a).