Donald Maxwell MILLER;  Janet Miller;
D.J. Miller Ranches Incorporated, an
Oregon Corporation;  D & J Ranches, a
Partnership Consisting of Donald Max-
well Miller  and Janet Claire Miller,
Plaintiffs–Appellants,

v.

UNITED STATES of America,
Defendant–Appellee.

No. 97–35847.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 5, 1998.

Decided Dec. 17, 1998.

William F. Schroeder (Argued), Carol De-Haven Skerjanec, Vale, Oregon, and W. Alan Schroeder, Boise, Idaho, for plaintiffs-appellants.

James L. Sutherland, Assistant United States Attorney, Eugene, Oregon, for defendant-appellee.

Before: NOONAN, THOMPSON, and TROTT, Circuit Judges.

TROTT, Circuit Judge:

Donald and Janet Miller, D.J. Miller Ranches, Inc., and D & J Ranches, a partnership consisting of Donald and Janet Miller ("the Millers") appeal the United States District Court of Oregon's grant of summary judgment for the United States. The Millers sued the United States Forest Service for damages incurred when a forest fire spread from the Ochoco National Forest onto their property. The district court granted the government's motion for summary judgment, holding that the discretionary function exception to the Federal Tort Claims Act ("FTCA") immunized the government from suit. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1993), and we affirm the district court's grant of summary judgment.

## I.

## FACTS

When lightning strikes the dry forests of eastern Oregon in August, fire follows. After ninety days with no rain and with temperatures above normal, a thunderstorm ignited several fires on the Snow Mountain Ranger District ("SMRD") of the Ochoco National Forest on August 6, 1990. Les Holsapple, the fire management officer for the SMRD, first spotted the fire that damaged the Miller's property ("the Bald Butte fire") around 7:00 p.m. In the course of that hour, several other fires were reported on the SMRD. Within fifteen minutes, Holsapple ordered aerial fire retardants and smokejumpers for the Bald Butte fire but was informed that retardant aircraft had already been committed to a fire in the Deschutes National Forest and that smokejumpers would be unable to reach the area before dark. Fire engines and bull dozers were ordered, along with other equipment available under equipment rental agreements. The four fire engines owned by the SMRD were all committed to other fires in the district, and Holsapple directed Dick Smith, the assistant Fire Management Officer who took over the initial attack on the fires, that direct ground-based attack on the Bald Butte fire would be ineffective given its current intensity levels and that they should find and suppress any other small fires before those fires created a problem. At that time the Bald Butte fire covered approximately 700–1,000 acres.

The Bald Butte fire was soon declared "escaped," and Holsapple advised the district ranger that it was unsafe to commit resources to the fire at that time. Smith went on to lead efforts to attack another fire on the SMRD, the Buck Springs fire. Although monitoring and suppression planning efforts for the Bald Butte fire were ongoing, on-the-ground fire suppression efforts did not occur until sometime on the afternoon of August 7, 1990, seventeen to twenty-three hours after the Bald Butte fire was first sited. The Bald

Butte fire soon joined two other fires, for a total size of approximately 6,000 acres. This coalescence of fires crossed onto the Millers' property sometime on the afternoon of August 9, 1990.

## II.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed de novo. *Margolis v. Ryan,* 140 F.3d 850, 852 (9th Cir.1998). This court must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.* at 852. The court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial. *Abdul–Jabbar v. General Motors Corp.,* 85 F.3d 407, 410 (9th Cir.1996). If the party moving for summary judgment meets its burden of showing that there is no genuine issue of material fact, the non-moving party may not rely on mere allegations but must set forth specific facts showing there is a genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987).

## III.

## THE DISCRETIONARY FUNCTION EXCEPTION TO THE FEDERAL TORT CLAIMS ACT

The FTCA waives sovereign immunity, allowing tort claims to be brought against the Government arising out of the negligent conduct of government agents acting within the scope of their employment. 28 U.S.C. §§ 2671–2680 (1994). The United States may be held liable "to the same extent as a private individual under like circumstances." § 2674. A limitation on the waiver of sovereign immunity exists, however, where the government is performing a "discretionary function." This exception immunizes the United States against

> any claim based on an act or omission of an employee of the Government ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

§ 2680(a). The discretionary function exception "marks the boundary between Congress's willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). It is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (quoting *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755).

The applicability of the discretionary function exception is determined by a two-part test. First, the exception covers only acts that are discretionary in nature, which necessarily involve an element of choice. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954; *Blackburn v. United States,* 100 F.3d 1426, 1429 (9th Cir.1996). The choice requirement is not satisfied where a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "[i]n this event, the employee has no rightful option but to adhere to the directive." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954.

Second, once the court determines that discretion is involved, there must also be a finding that the discretion involves the type of judgment that the exception is designed to shield. *Id.* The exception protects only government actions and decisions based on "social, economic, and political policy." *Id.* The decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis. *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267; *Federal Deposit Ins. Corp. v. Craft,* 157 F.3d 697, 707 (9th Cir.1998). Where the govern-

ment agent is exercising discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324, 111 S.Ct. 1267.

■ While the plaintiff bears the burden of coming forth with sufficient evidence to establish there are genuine issues of material fact regarding the applicability of the discretionary function exception, the government bears the burden of establishing that the test is met and that discretionary immunity applies. *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir.1992).

## IV.

## APPLICATION OF THE DISCRETIONARY FUNCTION TEST

### A.

### Discretion

■ Applying the first prong of the two-part test, the question is whether there was a federal statute, regulation, or policy in place that specifically prescribed a particular course of action by the Forest Service regarding the Bald Butte fire. Without choice, there can be no discretion.

The Millers point to four sources of mandatory language in support of their claim that discretion did not exist: the Forest Plan, the Code of Federal Regulations (via the Mobilization Guide), the statutory and common law of Oregon, and the PrePlanned Dispatch Blocks.

The Forest Plan outlines various "standards" which are mandatory requirements under the plan.[1] The Millers specifically point to language in the plan which requires employees to (1) monitor current and recent fire reports to target specific risks; (2) apply aggressive suppression action to wildfires that threaten assets, including private property, by initial attack; (3) provide equipment outside of the fire management organization to assist in the initial attack; and (4) meet the goal of controlling the fire by directly addressing the fire on the ground and pre-

paring an escaped fire analysis where appropriate.

Second, the Code of Federal Regulations ("CFR") refers to the Forest Service Manual as a "directive" which requires the preparation of a Mobilization Guide. The Mobilization Guide, in turn, provides that an employee must (1) report a discovered wildfire and take appropriate action until relieved; (2) not pass up an unmanned fire, even if the employee is not rated as meeting primary firefighter fitness standards; if the employee is the first qualified firefighter to arrive at the fire, (3) assume Incident Commander status until formally relieved; (4) not hesitate to use cooperator crews within the operation area; and if dispatcher, (5) assure sufficient initial attack forces are available within established time standards.

Third, the statutory and common law of Oregon requires landowners to immediately proceed to control and extinguish a fire on the landowner's property.

> Each owner and operator of forestland on which a fire exists or from which it may have spread, notwithstanding the origin or subsequent spread thereof, shall immediately proceed to control and extinguish such fire when its existence comes to the knowledge of the owner or operator, without awaiting instructions from the forester, and shall continue until the fire is extinguished.

Or.Rev.Stat. § 477.066 (1997).

Fourth, the PrePlanned Dispatch Blocks obligate the Forest Service to have the specific resources available in anticipation of fire.

The standards and procedures presented by the Millers fall short of meeting their burden for two reasons. First, none of the above requirements deal with the multiple fire situation. In fact, the Mobilization Guide, to the extent it does address multiple fire situations, confers discretion as part of its general procedure:

> During a multiple fire situation, such as a widespread lightning storm, *initial attack response may vary depending on avail-*

---

1. This contrasts with "guidelines" under the For- est Plan, which are discretionary.

*ability of resources.* The dispatcher will continue to use the dispatch cards as guidelines and *attempt* to meet preplanned response levels using any method available such as other agency and shared resources. The dispatcher will maintain close coordination with district fire management personnel in this situation.

(Emphasis added). This language makes clear that, while there are guidelines and preplanned response levels, things change when there is more than one fire to fight. This procedure discusses the very situation that occurred in this case: a lightning storm that created a number of fires over a widespread area. In such an instance, the inevitable competition for resources dictates discretion. As the district court noted, there simply are no specific directives that mandate specific action in a multiple fire situation.

Two district courts in this circuit have also held that discretionary immunity applies in multiple fire situations. *Parsons v. United States,* 811 F.Supp. 1411, 1421 (E.D.Cal. 1992); *Defrees v. United States,* 738 F.Supp. 380, 384 (D.Or.1990).

*Parsons* and *Defrees* both involved lightning-induced fires. 811 F.Supp. at 1412, 738 F.Supp. at 381. The plaintiffs in each case raised many of the same arguments presented here, including statutory and common law requirements to take fire suppression efforts, forest manual directives, and federal regulations regarding fire control. *Parsons,* 811 F.Supp. at 1415; *Defrees,* 738 F.Supp. at 382. The district courts found that the Forest Service retained "considerable discretion in deciding how to allocate suppression resources." *Defrees,* 738 F.Supp. at 385; *see Parsons,* 811 F.Supp. at 1420. We agree.

Second, while the above standards and procedures outline certain requirements for fire suppression, they do not eliminate discretion because they do not tell firefighters how to fight the fire. As the district court phrased it, they did not tell the Forest Service to suppress the fire in a specific manner and within a specific period of time. The existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion. *Blackburn,* 100 F.3d at 1429 (policy manuals mandating warnings necessarily involved discretion); *Valdez v. United States,* 56 F.3d 1177, 1179 (9th Cir.1995) (management guidelines, though using mandatory language, are mandatory only in the sense that they set forth broad policy goals attainable only by the exercise of discretion); *Childers v. United States,* 40 F.3d 973, 974 (9th Cir.1995) (statutes and procedures determining whether to post signs or close trails require discretion).

**B.**

**Policy Considerations**

The next question in the two-step analysis is whether the Forest Service's decision is susceptible to a policy analysis grounded in social, economic, or political concerns. *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267.

The Forest Manual outlines specific policies and objectives for fire suppression.

*5130.2—Objective.* The objective of fire suppression is to suppress wildfires at minimum cost consistent with land and resource management objectives and fire management direction as stated in fire management action plans.

*5130.3—Policy.* Conduct fire suppression in a timely, effective, and efficient manner with a high regard for public and firefighter safety.

*5131—Initial Action* ... 2. Initiate initial suppression action that provides for the most reasonable probability of minimizing fire suppression costs and resource damage, consistent with probable fire behavior, potential resource and environmental impacts, safety, and smoke management considerations.

These stated objectives and policies demonstrate that the Forest Service's decision regarding how to attack a fire involved a balancing of considerations, including cost, public safety, firefighter safety, and resource damage. These considerations reflect the type of economic, social and political concerns that the discretionary function exception is designed to protect.

In both *Parsons* and *Defrees,* the district courts held that decisions regarding the allocation of fire suppression resources are grounded in public policy.

"In establishing priorities, assigning government personnel and equipment, and deciding what private resources, if any should be used, these employees were required to make social and economic policy decisions. They were required to balance the value of communications installations, private homes, endangered species, and other resources."

*Parsons,* 811 F.Supp. at 1420 (quoting *Defrees,* 738 F.Supp. at 385).

There are many instances where the Forest Service's choices involving competing policy considerations were granted immunity. *See Blackburn,* 100 F.3d at 1434 (visitor enjoyment, preservation of historical features, avoiding intrusions, protection of wildlife); *Valdez,* 56 F.3d at 1180 (maximizing access and preservation of natural resources versus the need to minimize potential safety hazards); *Childers,* 40 F.3d at 976 (access versus safety).

The Millers point to *Summers v. United States,* 905 F.2d 1212, 1214 (9th Cir.1990), for the proposition that safety is not a consideration based on policy. *See also ARA Leisure Serv. v. United States,* 831 F.2d 193, 195 (9th Cir.1987) (design and construct of road was grounded in social and political policy, but failure to maintain road was a safety concern not grounded in policy). In *Summers,* a four-year-old girl was injured when she lost her balance and fell off a rock that was part of a fire ring on the beach in the Golden Gate Recreational Area. *Id.* at 1213. Summers burned her foot on the hot embers within the fire ring. *Id.* The court found that the discretionary function exception did not apply and did not preclude her suit, which was based on failure to follow regulations concerning visitor safety. *Id.*

Reliance on *Summers* is misplaced. In that case, the court specifically found that there was no evidence of competing policy considerations.

[A] governmental failure to warn is not necessarily shielded from suit simply because a discretionary function is in some way involved. On the contrary, we have concluded that "where the challenged governmental activity involves safety considerations under an established policy, rather than the balancing of competing policy considerations, the rationale for the exception falls away and the U.S. will be held responsible for the negligence of its employees."

*Id.* at 1215 (quoting *ARA Leisure Serv.,* 831 F.2d at 195). Unlike *Summers,* the case before us does require a balancing of policy concerns. While safety was one consideration, the decision regarding how to best approach the Bald Butte fire also required consideration of fire suppression costs, minimizing resource damage and environmental impacts, and protecting private property. The discretionary function exception is designed to prevent the judiciary from using its power to police the decisions of the executive branch. Our task is not to determine whether the Forest Service made the correct decision in its allocation of resources. Where the government is forced, as it was here, to balance competing concerns, immunity shields the decision.

## V.

### RAYONIER

The Millers rely heavily on *Rayonier Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), for the proposition that the FTCA does not provide government immunity for damage done to privately owned property resulting from a fire which spreads from government land. In *Rayonier,* a fire in eastern Washington covering 1,600 acres was finally brought under control by the Forest Service after five days of fire fighting. Certain spots continued to smolder. Over a month later, strong winds revived the fire, which then proceeded to cover over twenty miles and destroy the plaintiffs' property. *Id.* at 316–17, 77 S.Ct. at 375. The Supreme Court held that the FTCA did not shield the Forest Service from suit. *Id.* at 317–18, 77 S.Ct. 374.

The *Rayonier* decision, however, provides little guidance in this case for two reasons. First, *Rayonier* is not a discretionary function exception case. In *Rayonier,* the government did not argue for, nor did the Court consider, the discretionary function exception. Second, at the time *Rayonier* was decided, discretionary immunity did not have

the same interpretation it does under current law. It was not until 1984 that the Court formed the two-step analysis approach in *Varig Airlines*, 467 U.S. 797, 813–14, 104 S.Ct. 2755, 81 L.Ed.2d 660. *See*, William P. Kratzke, *The Supreme Court's Recent Overhaul of the Discretionary Function Exception to the Federal Tort Claims Act*, 7 Admin.L.J.Am.U. 1, 12 (1993). Since that time, the two-step approach has governed our analysis. Because the Supreme Court in *Rayonier* did not have the question before it of whether the discretionary function exception applied, and because it did not apply the two-step analysis now followed, *Rayonier* does not control our decision.[2]

## VI.

### CONCLUSION

The discretionary function exception to the Federal Tort Claims Act bars the Millers' suit against the Forest Service. Under the two-step approach, the Forest Service's decision regarding how to allocate resources in a multiple fire situation involved discretion and the consideration of competing economic and social policies. The presence of discretion and policy considerations immunizes the government from suit.

AFFIRMED.

---

**2.** We have recently applied *Rayonier* in *Anderson v. United States*, 55 F.3d 1379 (9th Cir.1995). In *Anderson*, property owners suffered damage when the Forest Service lost control of an intentionally-initiated fire. *Id.* at 1380. Like *Rayonier*, our examination of the briefs reveals that the government did not invoke discretionary function immunity, and the question of whether the exception applied was not before the court. Because the discretionary function analysis is absent, *Anderson*, like *Rayonier*, does not inform our decision in this case.