Elizabeth A. KELLY, individually and as Personal Representative of the Estate of Robert Eugene Kelly; Michael Kelly; Kenneth Kelly; Anne Marie Kelly, Plaintiffs–Appellees,

v.

UNITED STATES of America, Defendant–Appellant.

Rockey R. Lynn, Personal Representative of the Estate of Randy Clifford Lynn, Deceased, on Behalf of the Estate; Denise Lynn Warnken; Connie Lynn Gordon; Nicholas James Lynn; Clifford Connell Lynn; Madelon Jesse Lynn, Plaintiffs–Appellees,

v.

United States of America, Defendant–Appellant.

No. 99–35134.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 5, 2000

Filed Feb. 28, 2001

Charles W. Scarborough, United States Department of Justice, Civil Division, Washington, D.C., for appellant the United States of America.

Mark S. Connell, Connell Law Firm, Missoula, Montana, Brian K. Branch, Branch & Weingartner, Albuquerque, New Mexico, Cynthia A. Fry, Law Offices of Cynthia A. Fry, Albuquerque, New Mexico, for the appellees.

Before: ALARCON, FERGUSON and McKEOWN, Circuit Judges.

Opinion by Judge McKEOWN; Concurrence by Judge FERGUSON

McKEOWN, Circuit Judge:

This case strikes at the heart of one of the discretionary functions of the United States Forest Service—formulating the nature and type of flight training required of firefighter pilots. At issue is whether the United States is immune from liability under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1994) ("FTCA"), for the Forest Service's failure to require its contract pilots to undergo a specific type and form of training. Following a bench trial, the district court entered judgment for the families and estates of two pilots killed during a mission to drop retardant on a forest fire, finding that the Forest Service's failure to require the training con-

tributed to the deaths. The government appealed, arguing that the Forest Service's conduct is protected by the discretionary function exception to the FTCA.[1] We agree with the government. The extent and type of the Forest Service's flight training is a matter left to the agency's discretion and is susceptible to policy analysis. Accordingly, we reverse the district court and remand with direction to dismiss this case for lack of subject matter jurisdiction.

## BACKGROUND

The plaintiffs/appellees are the families and estates of two pilots, Robert Kelly and Randy Lynn, who died in 1994 when the airtanker they were using to drop flame retardant on a forest fire crashed in the Lolo National Forest, near Missoula, Montana. At the time of the accident, Kelly and Lynn were employed by Neptune, Inc., a company that contracted with the Forest Service to provide airtanker services to assist in fighting forest fires.

### A. The Accident

On the day of the accident, Kelly and Lynn, who were both well-qualified, experienced pilots, made several trips from an airtanker base in Missoula to drop retardant on various fires. All but the first mission were to fires in the Butler Creek area. While a lead plane aided Kelly and Lynn during their first few retardant drops, the Forest Service later redirected the lead plane to a higher priority fire. On the final run of the day, Kelly and Lynn were asked to perform a retardant drop on a small fire adjacent to the main fire. After circling twice around the area, the airtanker veered from the flight path and then crashed. Both pilots died at the scene.

### B. Aviation Safety and the Forest Service

As part of its broad mandate from Congress, the Forest Service, through delega-

---

1. The government also appealed the district court's finding of causation. Because the dis-

trict court was without jurisdiction, we do not address this issue.

tion from the Secretary of Agriculture, is charged with administering and protecting the nation's forests, consisting of approximately 187 million acres in 42 states. *See* 16 U.S.C. § 551 (1994); 36 C.F.R. § 200.3 (2000). In carrying out this responsibility, the Forest Service operates a firefighting program that relies significantly on aircraft. At the time of the accident, the Forest Service's aviation program consisted of 44 owned-and-operated aircraft, approximately 310 aircraft owned by the Forest Service and leased to the states, and approximately 1,050 aircraft under contract. The Forest Service contracted for approximately 30 airtankers.

The Forest Service issues regulatory guidance, policies, and directives, including the Forest Service Manual. Critical directives relating to aviation management are in section 5700 of that manual. Section 5700 requires "[i]mplement[ation] and administ[ration] [of] a national aviation safety program including but not limited to service-wide standards for pilot and aircraft approval, training and accident prevention."

In addition to the manual, the Forest Service issues other policies and guidance through a variety of other documents. Relevant to air safety, the USDA Forest Service Aviation Management Strategy 1991 (the "Management Strategy") gave guidance for developing local aviation management plans, including the national aviation safety program. Witnesses testified at trial that the Management Strategy was Forest Service policy and that management was required to follow it.

The Management Strategy included the Aviation Accident Prevention Program (the "Accident Plan"), which provides, in relevant part:

> It is management's responsibility to monitor contract and employee pilot performance and provide every opportunity for pilots to expand their knowledge and cultivate their skills. While proficiency

training is regarded by management as a productive means to accomplish this, *a concentrated effort must be placed on the human factor aspect of pilot performance.* Human factor information allows the pilots to better interface with the machinery and environment in which they operate. Therefore, *human factor training must be identified as a significant aspect of the accident prevention plan.*

(Emphasis added.) These two highlighted phrases are at the heart of the controversy here. The Accident Plan also states that "[m]ethods and/or requirements used by the [Fire Service] to achieve this standard of safety are contained in published manuals, handbooks, guides, contracts, and operations plans." Those documents do not, however, contain any requirement that contract pilots receive any human factor training, nor do any Forest Service documents mandate any specific type of human factor training.

A discussion of the various technical terms is in order. "Human factors" and crew resource management ("CRM") are related concepts but are neither co-extensive nor synonymous. "Human factors" is a generic term for "a multi-disciplinary field devoted to optimizing human performance and reducing human error." Federal Aviation Administration ("FAA") Advisory Circular 120–51A at 3. As one expert put it, human factors focuses on "interaction and interfacing of the man, machine and media." The FAA notes that CRM is "one way of addressing the challenge of optimizing the human/machine interface." FAA Advisory Circular 120–51A at 4.[2]

Trial witnesses testified that CRM training was developed to address the human tendency for the division of duties to break down when an unexpected situation arises, often with the result that even the most experienced crew members become preoc-

---

2. Federal regulations list CRM and "human factors" as distinct areas of aeronautical knowledge. *See* 14 C.F.R. § 61.155(c)(11) & (13) (2000).

cupied with fixing the problem rather than flying the plane. CRM training seeks to improve crew coordination and use, by all crew members, of all human and mechanical resources available during an emergency.

As part of its biannual Airtanker Elite Plane Remedial Conference, a workshop for airtanker pilots and others involved in aerial firefighting, the Forest Service sponsored a one-half day introduction to CRM, in lecture format. Otherwise, the Forest Service did not provide or require CRM training for its contract pilots. Although the contract between the Forest Service and Neptune required contract pilots to have certain flight experience, certifications, and training, it did not require CRM training, nor did the Forest Service ask Neptune to provide such training.

According to the Forest Service, its evaluations of airtanker pilots during annual flight safety check rides included human factors concepts. Forest Service witnesses testified that both Kelly and Lynn consistently demonstrated proficiency in crew coordination. Both pilots had received some CRM training. Kelly attended the Forest Service's one-half day seminar, as well as a three-day course, six months before the accident, which included human factors training (this training was independent of any action by the Forest Service). Although the record is not clear, at least one witness testified that Neptune provided Lynn with CRM training.

## C. Procedural History

After the crash, the plaintiffs sued the government under the FTCA, alleging negligence by the Forest Service. Claiming that airtanker operations are inherently dangerous and thus that the Forest Service owed the pilots a duty of care, the plaintiffs argued that the Forest Service breached this duty by (1) failing to provide a lead plane for retardant drops; (2) failing to provide an air attack supervisor; (3) requesting a dangerous retardant drop; (4) failing to impose appropriate flight and duty limitations to prevent pilot fatigue; and (5) failing to provide CRM training for airtanker contract pilots. The government moved to dismiss the claims on the ground that the Forest Service owed no duty of care to the pilots and, that even if it did, the claims were barred by the discretionary function exception to the FTCA. The district court denied the motion with respect to lack of duty and deferred ruling on the discretionary function exception issue.

After a six-day bench trial, the district court concluded that all but the claim for negligent failure to require CRM training were barred by the discretionary function exception. The district court concluded that the Accident Plan mandated such training and removed all discretion. The district court then held that the Forest Service's failure to require CRM training was negligent and that this negligence contributed to the accident. After reducing the damages award by thirty percent to account for the pilots' comparative fault, the district court entered judgment, awarding $2,616,039 to the Lynn plaintiffs and $883,934 to the Kelly plaintiffs. This appeal by the government followed.

### ANALYSIS

Whether the United States is immune from liability under the Federal Tort Claims Act is a question of law reviewed de novo. *Fang v. United States,* 140 F.3d 1238, 1241 (9th Cir.1998).

The FTCA provides a broad waiver of the government's sovereign immunity for "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b) (Supp. IV 1998). In those cases, the government may be held liable for negligence "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. This waiver of immunity is limited, however; the government is not liable for claims

based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This exception is commonly known as the "discretionary function" exception. "Where the exception applies, the court lacks subject matter jurisdiction." *GATX/Airlog Co. v. United States*, 234 F.3d 1089, 1094 (9th Cir.2000).

■ In *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), the Supreme Court laid out the now familiar two-part test that governs application of the discretionary function exception: (1) the challenged conduct must be discretionary-that is, it must involve an element of judgment or choice; and (2) "that judgment [must be] of the kind that the discretionary function exception was designed to shield." The government bears the burden of proving both of these prongs. *Reed v. United States Dep't of the Interior*, 231 F.3d 501, 503 (9th Cir.2000).

■■ Under the first prong of the *Berkovitz* test, where the alleged conduct violates a mandatory directive, whether by statute, regulation or policy, the conduct is not discretionary because there is no choice or judgment involved. *See United States v. Gaubert*, 499 U.S. 315, 324, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). As we noted in *GATX/Airlog*, 234 F.3d at 1094, "discretion is the benchmark of this self-referential prong of the discretionary function test." The second prong of the *Berkovitz* test-policy analysis-is grounded in the notion that the discretionary function exception is designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). Whether a challenged action falls within the discretionary function exception requires a particularized analysis of the specific agency action challenged. *See United Cook Inlet Drift Ass'n v. Trinidad Corp. (In re Glacier Bay)*, 71 F.3d 1447, 1451, 1455 (9th Cir.1995).

## A. The Forest Service's conduct here was discretionary.

■ The Forest Service's conduct-not requiring its contract pilots to have CRM training-was discretionary and, thus, the government satisfies the first prong of the *Berkovitz* test. The plaintiffs point to no statute, regulation, or policy that mandates the Forest Service to require such training. Rather, the plaintiffs point only to two sentences in the Accident Plan:

[A] concentrated effort must be placed on the human factor aspect of pilot performance.... [H]uman factor training must be identified as a significant aspect of the accident prevention plan.

Although the Forest Service highlighted CRM concepts at the one-half-day seminar and evaluated human factors during check rides, the plaintiffs argue that the Accident Plan provision mandated the Forest Service not only to require CRM training, but a *specific type* of CRM training; that is, something *more* than CRM training in lecture format. The district court agreed with the plaintiffs, concluding that "[t]he decision to identify and require 'human factor' or 'crew resource management' training is not discretionary."

The plaintiffs' argument, and the district court's conclusion, cannot be sustained. First and foremost, the Accident Plan provision *does not mention* CRM training, let alone require a specific type of CRM training. The provision merely requires the Forest Service to "identif[y]" "human factor training" as a significant component of the accident prevention plan. The district court erred by treating "human factor" and "CRM" synonymously, and by substituting "require[d]" for "identified." Moreover, the Accident Plan does not define

"human factor training"; indicate what the Forest Service must do to comply with the provision; identify the nature or extent of the training; or indicate who must receive the training, who must provide it, or when it must do so. All of these matters are left to the Forest Service's discretion.

We have repeatedly held that a general regulation or policy, like the Accident Plan here, does not remove discretion unless it specifically prescribes a course of conduct. For example, in *Miller v. United States,* 163 F.3d 591, 597 (9th Cir.1998), we held that the Forest Service's decisions regarding how to fight a fire in a multiple fire situation were protected by the discretionary function exception. Although various standards and procedures in *Miller* included mandatory language regarding requirements for fire suppression, they did not address the multiple fire situation or "tell firefighters how to fight the fire." *Id.* at 595. We concluded that "[t]he existence of some mandatory language does not eliminate discretion when the broader goals sought to be achieved necessarily involve an element of discretion." *Id.* at 595.

We have reached similar conclusions in other cases where broad mandates did not specify a course of conduct for the government to follow. *See, e.g., Blackburn v. United States,* 100 F.3d 1426, 1431 (9th Cir.1996) (holding that Park Service's actions were protected by the discretionary function exception where policy manuals outlined general policy goals regarding safety and mandated warning the public of hazards, but did not specify how to meet those goals or how or when to warn the public); *Sabow v. United States,* 93 F.3d 1445, 1453 (9th Cir.1996) ("[T]he presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations."); *Valdez v. United States,* 56 F.3d 1177, 1180 (9th Cir.1995) (concluding that broad mandate to warn the public of hazards did not render conduct nondiscretionary because "[the] guidelines can be considered manda-

tory only in the larger sense that they set forth broad policy goals attainable only by the exercise of discretionary decisions"); *Childers v. United States,* 40 F.3d 973, 976 (9th Cir.1994) (concluding that "decisions as to the precise manner in which [the National Park Service] would warn the public ... clearly fall within the discretionary function exception" despite safety manual requirement that National Park Service warn public if it decided not to close certain trails).

Other circuit courts have also concluded that a broad mandate does not foreclose discretion. *See, e.g., Duke v. Dep't of Agric.,* 131 F.3d 1407, 1410 (10th Cir.1997) ("While the[ ] [Forest Service] manuals emphasize safety and appropriate warnings they are not specific enough to eliminate the Forest Service employees' choice regarding how to act in particular circumstances."); *Rosebush v. United States,* 119 F.3d 438, 442 (6th Cir.1997) (concluding that Forest Service manual provision requiring Forest Service to prepare an " 'operation and maintenance' plan which gives health and safety related items the 'highest priority' ... vest[s] complete discretion in the Forest Service as to the development and implementation" of that plan); *Autery v. United States,* 992 F.2d 1523, 1528–29 (11th Cir.1993) (concluding that National Park Service policy to "make every effort ... to recognize and report" hazardous trees "prescribed neither a particular method of inspection nor special rules" for inspecting particular trees; "[s]uch a general guideline is insufficient to deprive the federal government of the protection of the discretionary function exception").

Despite these cases, the plaintiffs argue that this case is governed by *Berkovitz* and *Faber v. United States,* 56 F.3d 1122, 1128 (9th Cir.1995). In *Berkovitz,* 486 U.S. at 533, 108 S.Ct. 1954, the Supreme Court addressed whether the discretionary function exception barred a suit based on the government's licensing of an oral polio vaccine and subsequent approval of the re-

lease of a specific lot of that vaccine. The Court noted that the Division of Biologic Standards (then part of the National Institutes of Health) ("DBS") may issue a license only after examining the vaccine and determining that it complies with regulatory safety standards. Therefore, the Court concluded, if the plaintiffs claimed that the DBS licensed the vaccine either without determining whether it complied with regulatory standards or after determining that the vaccine failed to comply, the discretionary function exception did not bar the claim. *Id.* at 544, 108 S.Ct. 1954. The Court stated, "[w]hen a suit charges an agency with failing to act in accord with a specific mandatory directive, the discretionary function exception does not apply." *Id.*

We followed the Court's instruction in *Faber*, 56 F.3d at 1128, where we held that the discretionary function exception did not protect the Forest Service's failure to act in violation of a mandatory directive. In *Faber*, a Forest Service plan required specific action in response to an increase in accidents in the park: (1) develop a sign plan, (2) formulate a media program, and (3) provide a presence to verbally warn the public. *Id.* at 1126. The plan did not specify how to go about doing so. *See id.* The Forest Service, however, failed to take any of those actions. *Id.* Therefore, we held that the discretionary function exception did not apply:

> The Forest Service had no choice but to follow the ... plan. The plan did not give the Forest Service the option to do nothing.... To the contrary, the ... plan listed three specific and mandatory measures that the Forest Service was to take in order to increase safety.... The Forest Service failed to implement all three.... Because the challenged conduct of the Forest Service was in direct contravention of a specifically pre-

scribed federal policy, the discretionary function exception does not apply.

*Id.* (citation omitted); *accord Childers,* 40 F.3d at 976 ("The discretionary function exception would not apply if the [National Park Service] ignored the safety manual's mandate that the public be 'adequately warned.'").

But the Forest Service here did not fail to act in violation of a specific mandatory directive. The Accident Plan mandated only that the Forest Service identify human factor training as a significant aspect of its accident prevention plan-it did not mandate the Forest Service to require its contract pilots to have CRM training. Indeed, the Forest Service did include human factors training as part of its accident prevention program. In short, the Forest Service had discretion whether to require CRM training, a specific type of training that includes aspects of human factors training. Therefore, the government satisfies the first prong of the *Berkovitz* test.

**B.  The Forest Service's conduct is susceptible to policy analysis.**

■ The Forest Service's conduct also fits within the second prong of the *Berkovitz* test as is susceptible to policy analysis.[3] The decision whether to require CRM training of contract pilots necessarily implicates competing policy considerations, such as employee and public safety, economic resources (including the number of individuals to be trained, the extent and cost of training, and the agency's resources), impact on the agency's relationship with contractors, and the agency's goals and duties. *See Gager v. United States,* 149 F.3d 918, 921 (9th Cir.1998). As the District of Columbia Circuit aptly observed, "[t]he extent of training with which to provide employees requires consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee

3.  Because the district court concluded that the Forest Service's conduct was not discretionary, it did not reach this issue.

might cause, and the extent to which employees have deviated from accepted norms in the past." *Burkhart v. Washington Metro. Area Transit Auth.,* 112 F.3d 1207, 1217 (D.C.Cir.1997).[4]

We recently confirmed that "[t]his court and others have held that decisions relating to the ... training ... of employees usually involve policy judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States,* 228 F.3d 944, 950 (9th Cir. 2000) (concluding that the Immigration and Naturalization Service's decision to excuse an employee from handgun training "involved a judgment that is subject to the discretionary function exception and is not actionable"); *accord Nurse v. United States,* 226 F.3d 996, 1001 (9th Cir.2000) (concluding that alleged negligent and reckless training "fall[s] squarely within the discretionary function exception"); *Gager,* 149 F.3d at 922 (concluding that Postal Service's decision not to provide training to detect mail bombs "was clearly rooted in social, economic, and political policy" and protected by the discretionary function exception); *Fang,* 140 F.3d at 1242 (noting that decisions regarding training of emergency medical technicians are "fully protected by the discretionary function exception"); *Burkhart,* 112 F.3d at 1217 ("The extent of training with which to provide employees ... [is] surely among those [decisions] involving the exercise of political, social, or economic judgment."); *Redmon v. United States,* 934 F.2d 1151, 1156 (10th Cir.1991) (concluding that the FAA's decision to allow single-engine-rated pilots to carry over that rating to a multi-engine rating without a flight test "falls squarely within the discretionary function exception"). We likewise hold that the Forest Service's decision whether to require its contract pilots to undergo CRM training is a policy judgment that is protected by the discretionary function exception.

■ We are not persuaded by the plaintiffs' argument that policy-based judgment is not involved here because the Forest Service failed to follow industry safety standards and failed to act in the face of a known hazard-i.e., human factors error, which, the plaintiffs argue, is the leading factor in aviation accidents. As the plaintiffs point out, we have held that an agency's failure to follow safety standards and failure to warn the public of known hazards created by the agency are not protected by the discretionary function exception. *See, e.g., Sutton v. Earles,* 26 F.3d 903, 910 (9th Cir.1994) (holding that failure to post speed limit signs is not protected by the discretionary function exception, concluding that "[a] decision not to warn of a specific, known hazard for which the acting agency is responsible is not the kind of broader social, economic or political policy decision that the discretionary function exception is intended to protect"); *Arizona Maint. Co. v. United States,* 864 F.2d 1497, 1503 (9th Cir.1989) ("Where the 'choice' is a failure or refusal to follow safety standards, there is no immunity."); *ARA Leisure Servs. v. United States,* 831 F.2d 193, 195 (9th Cir.1987) (holding that failure to maintain road in safe condition is not protected by the discretionary function exception because the conduct involves safety considerations under an established policy rather than competing public policy considerations). Here, however, there was no safety standard, industry or otherwise, with respect to requiring contract pilots to have CRM training; nor do the plaintiffs claim that the Forest Service created a hazard and failed to provide adequate warning. Rather, the Forest Service's conduct-not requiring a specific type of

---

**4.** Although the District of Columbia Circuit addressed the extent of training to provide to employees rather than contract workers, both decisions invoke policy considerations. In fact, because the contractor context necessarily involves the agency's relationship with the contractor and considerations concerning the extent to which the agency should involve itself in training the contractor's employees, the contractor context invokes additional policy considerations.

training for non-employees-involved judgment "of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. 1954.[5]

Finally, the plaintiffs attempt to distinguish cases involving alleged failures to protect members of the public (which, they argue, involve policy considerations) from cases involving alleged failures to protect employees or contractors (which, they argue, do not involve policy considerations). In the context of aviation training, which surely affects the public as well as employees and contract workers, we find no support for this distinction, nor do we find it persuasive.

## CONCLUSION

The district court erred by failing to dismiss this case for lack of subject matter jurisdiction. The Forest Service's decision not to require its contract pilots to have a specific type of training is protected by the discretionary function exception to the Federal Tort Claims Act. Therefore, we **REVERSE** the district court and **REMAND** with direction to dismiss this case for lack of subject matter jurisdiction.

FERGUSON, Circuit Judge, concurring:

I concur in Judge McKeown's opinion. I write to emphasize the facts surrounding the airplane crash.

On the final run of the day when they taxied out for takeoff, the pilots made mistakes, including failing to enter read back instructions from the central tower or communicate the read back to each other and crossing an active runway without permission from the traffic controller. However, they were extremely well-qualified and experienced pilots. Both of them had received some formal crew resource man-

agement ("CRM") training and both pilots consistently demonstrated proficiency in crew coordination.

When Kelly and Lynn arrived at the fire, they entered a circular holding pattern and contacted ground firefighters for instructions. After receiving the requested drop pattern, the tanker left its orbit and began descending. At that point, something went wrong. The district court, adopting the findings of the government's reconstruction expert, found that when the crew attempted to activate the tanker's auxiliary jet engines in preparation for the run, the engines "flamed out," probably because the crew had failed to transfer fuel from the plane's main tanks to the outboard tanks while en route to the fire. The crew then attempted to re-start the engines by descending in order to gain airspeed, which would allow them to "air start" the jets without having to use the mechanical starter. In the process, however, both Kelly and Lynn became focused on trying to re-start the engines, and both lost "situational awareness"—meaning that neither one was paying attention to the surrounding terrain. During this time, the plane entered a narrow drainage at a dangerously low altitude. By the time the crew regained situational awareness and became aware of the danger, it was too late to turn around or climb out of the drainage. After jettisoning part of its retardant load, presumably a last-ditch effort to shed weight, the plane crash landed in thick timber at the upper end of the drainage. Both Kelly and Lynn survived the crash essentially uninjured, but were engulfed by flames while trying to escape the burning aircraft. Both men died of burns at the scene.

The cause of pilot error was 1) a captain who was worn out and fatigued and 2) a

---

5. The plaintiffs also argue that the decision not to require CRM training was not grounded in policy considerations because the Forest Service could have delegated the costs of CRM training to the contractors. This "pass-through" argument does not avoid the basic policy considerations with respect to training.

And, to be protected by the discretionary function exception, the conduct " 'need not *actually* be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.' " *Nurse*, 226 F.3d at 1001 (quoting *Miller*, 163 F.3d at 593).

loss of situational awareness that led to the entry into a blind canyon from which the plane could not escape. In plain language the pilots were not watching where they were going.

If there is one thing that all of us learn from the time that we begin to walk, ride a tricycle, rollerskate, drive a car, pilot an airplane, it is to understand an absolute, imperative, simple basic rule—watch where you are going. Here, the pilots did not. The government cannot be faulted. The Federal Tort Claims Act does not make the Government an insurer.